In the United States District Court
Eastern District of Texas
Sherman Division

| | | |
|---|---|---|
| James Dowd | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:21-CV-125-SDJ |
| | § | |
| TubeMaster, Inc. | § | |
| | § | |
| | § | |
| Defendants. | § | |

## Plaintiff's Amended  Complaint

Plaintiff James Dowd ("Dowd" or "Plaintiff") files this Amended Complaint

against TubeMaster, Inc. ("TubeMaster" or "Defendant") and shows:

## Parties

1.   Plaintiff James Dowd is an individual citizen of Texas and a resident of Collin

County, Texas.

2.   Defendant TubeMaster, Inc. is a foreign corporation doing business in Texas. It is

a citizen of Kentucky.  It has been served and appeared in this lawsuit.

## Venue and Jurisdiction

3.   Venue is proper in Collin County, Texas because all of a substantial part of the

events or omissions establishing the claims occurred in Collin County, which is in the

Eastern District of Texas. Venue is also proper in Collin County and the Eastern District

of Texas because the parties entered into an Employment Agreement that specified

Collin County as the mandatory venue for any legal proceeding related to the Agreement.

4. This Court has federal jurisdiction over the claims asserted under the ADEA, 29 U.S.C. § 621 *et. seq.* and diversity jurisdiction of Dowd's Texas Labor Code Ch. 21 and other state law claims because the parties are citizens of different states and there is more than $75,000 in controversy.

## Factual Background

5. TubeMaster, is a company headquartered in Kentucky. Clifford Johns is the CEO and founder of it. Johns is the sole shareholder of TubeMaster.

6. TubeMaster, through Johns, contacted and hired Dowd in December 2014 as its Vice President of Global Sales & Marketing. TubeMaster knew Dowd through previous business and personal relationships, including hiring Dowd as a temporary employee for a short period in July 2011 for a project.

7. When TubeMaster hired Dowd in December 2014, the parties executed an Employment Contract Agreement ("Agreement"). A copy of the Agreement is attached as Exhibit 1. Under the Agreement, Dowd would continue to reside in Texas and provide services to TubeMaster from Plano, Texas. Dowd would travel to Kentucky (or other locations) as needed.

8.    After TubeMaster hired Dowd, Johns became a resident of Texas and used Dowd's home address as his Texas address, claiming that Johns wanted to be based in Texas to have greater access to the Texas and Louisiana markets.

9.    The Agreement was effective on January 1, 2015 and was to expire on December 31, 2017. However, the Agreement allowed for the renewal of the Agreement by the written agreement of the parties. However, if the parties failed to produce a written agreement of renewal within the stated time period, then the Agreement is extended month to month until it was renewed or terminated.

10.    When TubeMaster, through Johns, promoted Dowd to President in January 2016, Johns told Dowd he could not afford a change in Dowd's compensation at the time due to the financial status of the company. However, Johns promised to adjust Dowd's compensation once the company was more financially stable, including back pay for Dowd.

11.    The parties did not formally renew or terminate the Agreement after the anticipated December 31, 2017 termination date. The Agreement remained in effect month to month from January 1, 2018 until June 2018. In June 2018, the parties modified both the term of the Agreement and the amount Dowd was to be paid.

12.    The parties originally agreed that Dowd would be paid a base salary $1,500 per week. He would also receive certain benefits and, by the third year, he would receive four weeks of paid vacation.

13.   In June 2018, the parties modified the compensation terms and the length of term of the Agreement by written agreement. Dowd had secured a large license agreement for TubeMaster in February 2018. Thus, Dowd approached Johns about a change in the Agreement to reward Dowd for his efforts in securing this large and profitable license agreement. Dowd approached Johns about this because Johns had promised to increase Dowd's pay, including giving him retroactive backpay, once the company was on stronger financial footing. Because of Dowd's business strategy and the large license agreement, TubeMaster was now more financially stable. Thus, Dowd presented Johns with a spreadsheet that outlined four continued employment and compensation options. The fourth option extended Dowd's employment through December 2021 and called for Dowd to receive a large bonus that would be paid out in three installments over time.

14.   TubeMaster, through Johns, chose the fourth option. This required TubeMaster to pay Dowd a base salary of $10,000 per month through December 2021 and three bonus payments of $103,333.34. A copy of this spreadsheet is attached as Exhibit 2. This option also required TubeMaster to retroactively pay Dowd deferred salary for 2016, 2017 and part of 2018, which it did.

15.   Beginning in June 2018 and from that point forward, TubeMaster paid Dowd consistently with the modified Agreement. TubeMaster increased Dowd's monthly pay, made the deferred salary payments, and made  two of the three required bonus

installment payments in June 2018 and August 2019. TubeMaster then only owed Dowd one additional installment payment due in February 2021.

16.  TubeMaster fired Dowd on April 29, 2020. His last day of work was April 30, 2020.

17.  When TubeMaster fired Dowd, it owed him the compensation remaining on the Agreement through December 2021, his 4 weeks' vacation pay and the final bonus payment due in February 2021.

18.  When TubeMaster fired Dowd, it originally paid him the vacation pay owed to him. Yet, TubeMaster, through Johns, immediately  reversed payment of the vacation funds out of Dowd's account. Even though written company policy and the Agreement required payment of the vacation pay and even though TubeMaster paid vacation pay to other terminated employees, TubeMaster failed and refused to pay it to Dowd.

19.  TubeMaster, through Johns, completely deleted Dowd's account from the company payroll and retirement systems. By willfully and knowingly deleting his account, this locked Dowd out of his 401(k) account and prevented Dowd's  access to his 401(k) account. Dowd had to spend months attempting to work with Johns before receiving a response.  TubeMaster's payroll provider had to fully recreate  his account  in order for Dowd to be able to access his own 401(k) account, tax documents, and payroll records.

20.  TubeMaster did not pay Dowd the compensation remaining on the Agreement through December 2021.

21.   In a telephone conversation with Dowd after his termination, Johns reaffirmed that he owed Dowd the final installment of the bonus and said that he would pay the final installment of the bonus.

22.   TubeMaster did not pay Dowd the final installment of the bonus owed that was to be paid in February 2021.

23.   Dowd formally presented his claim to TubeMaster on June 29, 2020. TubeMaster has not yet paid Dowd the amounts it owes him.

24.   When TubeMaster fired Dowd, Dowd was age 62.

25.   TubeMaster, through Johns, had been asking Dowd regularly and consistently about his retirement plans for approximately one (1) year before termination. Starting in May 2019, Johns asked Dowd questions such as "I know you're getting older , are you ready to retire?"  He also repeatedly asked, "when are you going to retire?"  Dowd responded clearly that he had no plans to retire.

26.   TubeMaster, through Johns, continued to push Dowd about his retirement plans and to encourage Dowd to retire. TubeMaster, through Johns, repeatedly inquired when Dowd planned to retire when Dowd would visit TubeMaster's Kentucky office. This occurred in June, August, October, November, and December of 2019 and again in January and March 2020.

27.   Johns made repeated phone calls to Dowd after normal business hours on nights and weekends and would ask Dowd about his health and when he planned to retire.

28.   In March 2020, at a dinner meeting with Johns in Louisville, Kentucky, Johns again asked Dowd when Dowd planned to retire. Dowd explained to Johns he had no plans to retire. Dowd also explained to Johns that Dowd expected Johns to fulfill his commitments and obligations to Dowd. Because Dowd was owed the final installment of the bonus in February 2021, Dowd stated that he did not want to consider retiring before he received that final installment payment.

29.   In that dinner meeting in March 2020, Dowd also explained to Johns that Dowd had upcoming medical procedures scheduled and needed to continue to have company health insurance coverage.

30.   While employed by TubeMaster Dowd suffered from disabilities. Dowd's disabilities include Crohn's disease and being a four time cancer survivor. Dowd also suffers from claustrophobia.

31.   Dowd's disabilities would be aggravated by stress. TubeMaster, through Johns, would continually question Dowd's conditions and make fun of and joke about Dowd's disabilities. Johns would ask Dowd if the stress of Johns' actions was affecting Dowd's conditions and tell Dowd that Dowd was "not tough." Johns also made offensive "bathroom" jokes to Dowd because of Dowd's Crohn's disease.

32.   Johns would tell Dowd that some of Dowd's disabilities (the claustrophobia) were "all in his head" and that Dowd could "get over it" if he wanted to. Dowd requested the

accommodation of not entering into small, confined spaces on job sites and Johns would fail to accommodate this disability.

33.   TubeMaster, through Johns, harassed Dowd because of his disabilities and created a hostile environment for Dowd by that harassment.

34.   Johns eventually excluded Dowd from participating in many field projects even though Dowd could perform multiple services, duties and responsibilities if he did not need to enter into a small, confined space.

35.   After he was terminated, Dowd timely filed a Charge of Discrimination with the EEOC asserting discrimination because of age and disability on September 30, 2020. Dowd's Charge of Discrimination has not been resolved. Dowd timely sues for discrimination on these two claims.

## Causes of Action

### Breach of Contract against TubeMaster[1]

36.   Dowd incorporates the preceding paragraphs as if restated.

37.   Dowd and TubeMaster entered into an enforceable Agreement in December 2014. (Exhibit 1). The parties modified the Agreement in terms of its length and the compensation terms in June 2018. The modification is reflected in the spreadsheet prepared by Dowd and agreed to by Johns. (Exhibit 2).

---

[1] Dowd files this Amended Complaint in compliance with the Court's February 24, 2021 Order and Advisory (Dkt. #4). By doing so, Dowd does not waive his contention that the Collin County District Court properly entered a default judgment on Dowd's breach of contract claims.

38.   Dowd is a proper party to sue for breach of this contract

39.   Dowd performed all obligations required of him by the contract.

40.   TubeMaster terminated Dowd on April 29, 2020.

41.   TubeMaster breached its contractual agreement with Dowd by failing and refusing to pay Dowd the pay owed under the Agreement including his compensation through December 2021.

42.   TubeMaster breached its contractual agreement with Dowd by failing and refusing to pay Dowd the large final installment payment for the bonus due to be paid in February 2021.

43.   Under the Agreement, TubeMaster, owes Dowd his compensation pay of $10,000 per month with associated benefits through December 2021 and the large final installment payment for the bonus due in February 2021.

44.   TubeMaster also breached its contractual agreement by failing to pay Dowd the vacation pay owed to Dowd upon his termination.

45.   TubeMaster's breach of the contract damaged Dowd and caused him financial injury.

46.   Though Dowd presented his claim in June 2020, TubeMaster refused to pay Dowd the amount owed.

47.   Dowd seeks to recover all actual and consequential damages he has suffered because of TubeMaster's breach of its contractual obligations owed to him.

48.   Dowd also seeks to recover pre- and post-judgment interest and his reasonable attorneys' fees and costs in pursuit of this claim under Tex. Civ. Prac. & Rem. Code § 38.001 *et. seq.* All conditions precedent to the recovery of attorney's fees under § 38.001 have been fulfilled.

### Failure to Pay Bonuses under Texas Labor Code § 61.015 against TubeMaster

49.   Dowd incorporates the preceding paragraphs as if restated.

50.   Dowd and TubeMaster entered into an enforceable agreement for TubeMaster to pay Dowd a bonus of $103,333.34 in February 2021. The bonus represents the final installment of the bonus TubeMaster agreed to pay Dowd because of Dowd's work in securing a large license agreement for TubeMaster in February 2018. TubeMaster agreed to pay Dowd a bonus in three installments as a reward for that work. It paid two of the three installments.

51.   Dowd did all the work required to earn this final installment payment before his employment with TubeMaster ended.

52.   TubeMaster's obligation to pay Dowd this final installment payment continues even after Dowd's employment ended.

53.   Under Texas law, *unless otherwise agreed*, the employer shall pay, after separation, commissions or bonuses earned as of the time of separation. Tex. Labor Code § 61.015; 40 Tex. Admin. Code § 821.26(b).

54.   TubeMaster and Dowd did not agree that Dowd's ability to receive this final installment payment of the bonus would cease upon the termination of employment.

55.   TubeMaster, through Johns, reaffirmed the obligation to pay Dowd the final installment payment of the bonus in a telephone conversation with Dowd after TubeMaster terminated Dowd.

56.   TubeMaster owes Dowd the final installment payment as it collects payments from its client on the license agreement.

57.   TubeMaster failed and refused to pay Dowd this final installment of the bonus in February 2021.

58.   TubeMaster's failure to comply with Texas Labor Code § 61.015 damaged Dowd and caused him financial injury. The final installment owed by TubeMaster is $103,333.34.

59.   Dowd seeks to recover all actual and consequential damages he has suffered because of TubeMaster's failure to pay this final installment payment on his bonus.

60.   Dowd also seeks to recover pre- and post-judgment interest and his reasonable attorneys' fees and costs in pursuit of this claim.

### Promissory Estoppel against TubeMaster

61.   Dowd incorporates the preceding paragraphs as if restated.

62.   Dowd alternatively asserts a claim for promissory estoppel against TubeMaster.

63.   TubeMaster, through Johns, promised Dowd that Dowd would receive (1) the pay through December 2021 and (2) the final installment payment for his bonus in February

2021. TubeMaster, through Johns, reaffirmed this promise to pay the final installment of the bonus in a telephone conversation with Dowd after TubeMaster terminated Dowd.

64.   Dowd reasonably and substantially relied on TubeMaster's promises to his detriment.

65.   Dowd's reliance on TubeMaster's promises was foreseeable to TubeMaster.

66.   TubeMaster breached its promises to Dowd by failing to provide Dowd with compensation owed and the final installment payment on the bonus owed.

67.   Injustice can only be avoided by enforcing TubeMaster's promises to Dowd.

68.   Dowd seeks to recover all damages he suffered because of TubeMaster's promises.

69.   Dowd seeks to recover his reasonable and necessary attorneys' fees incurred in pursuit of this claim and pre-judgment and post-judgment interest and court costs.

## Quantum Meruit against TubeMaster

70.   Dowd incorporates the preceding paragraphs as if restated.

71.   Alternatively, Dowd pleads a claim for quantum meruit.

72.   Dowd provided valuable services to TubeMaster.

73.   Dowd's services were provided for TubeMaster and benefitted TubeMaster.

74.   TubeMaster accepted Dowd's valuable services.

75.   TubeMaster had reasonable notice that Dowd expected compensation for his valuable services in the form of pay through December 2021 and the payment of the final installment of his bonus in February 2021.

76.   TubeMaster failed and refused to provide the compensation it knew Dowd expected in return for his valuable services. TubeMaster failed to pay Dowd the full compensation owed through December 2021. TubeMaster, through Johns, told Dowd it would not pay him the final installment payment on the bonus owed in February 2021.

77.   TubeMaster's failure to pay Dowd the full compensation and bonus it knew Dowd expected damaged Dowd.

78.   Dowd presented his claim for damages to TubeMaster, but TubeMaster failed to pay his claim.

79.   Dowd sues TubeMaster for all damages he suffered under a theory of quantum meruit. Dowd seeks to recover the full reasonable value of the services he provided to TubeMaster.

80.   Dowd also seeks to recover his reasonable attorneys' fees in pursuit of this claim and pre-judgment and post-judgment interest. All conditions precedent to the recovery of attorneys' fees have been performed.

## Unjust Enrichment against TubeMaster and Johns

81.   Dowd incorporates the preceding paragraphs as if restated.

82.   Dowd alternatively asserts a claim for unjust enrichment. TubeMaster induced Dowd to continue to work for TubeMaster by promising him compensation through December 2021 and a final installment payment on the bonus to be paid in February 2021.

TubeMaster knew that Dowd would not have continued his employment unless TubeMaster agreed to this change in his compensation.

83.   When it fired Dowd, TubeMaster did not pay him the compensation owed nor the final installment payment for the bonus.

84.   TubeMaster has wrongfully secured a benefit or passively received a benefit which it would be unconscionable to allow TubeMaster to retain.

85.   If TubeMaster is allowed to retain the benefits promised Dowd, TubeMaster would be unjustly enriched.

86.   Under these circumstances, equity requires that TubeMaster not be allowed to be unjustly enriched and that equity requires that Dowd be made whole and receive the benefits he was promised by TubeMaster.

87.   Dowd seeks those benefits from TubeMaster under the theory of unjust enrichment to compensate him for the pay and final installment payment for the bonus TubeMaster retained from Dowd's efforts on its behalf.

88.   Dowd seeks all damages he may receive including any pre-judgment and post-judgment interest, attorneys' fees and costs.

## Age Discrimination under ADEA

89.   Dowd incorporates the preceding paragraphs as if restated.

90.   TubeMaster is an employer as defined by the ADEA, 29 U.S.C. § 630.

91.   Dowd, age 62, is an employee covered by the ADEA. 29 U.S.C. § 630(f).

92.   TubeMaster discriminated against Dowd in the terms and conditions of his employment and singularly subjected him to disparate treatment as compared to other employees because of his age in violation of the ADEA. 29 U.S. C. § 623(a). TubeMaster regularly inquired when Dowd intended to retire and kept pushing Dowd to retire.

93.   TubeMaster discriminated against Dowd and terminated Dowd because of his age in violation of the ADEA. 29 U.S.C. § 623(a).

94.   TubeMaster's violations of the ADEA damaged Dowd. Dowd seeks to recover all legal and equitable relief to which he is entitled because of the discriminatory actions of TubeMaster in violation of the ADEA.

95.   Dowd seeks to recover his back pay and the value of his lost employment benefits, liquidated damages, the equitable remedy of reinstatement, prejudgment and post-judgment interest and his reasonable attorney's fees and costs.

### Age Discrimination under Texas Labor Code Chapter 21

96.   Dowd incorporates the previous paragraphs as if restated.

97.   TubeMaster is an employer for Texas Labor Code § 21.002.

98.   Dowd, age 62, is protected from age discrimination under Texas Labor Code Chapter 21.

99.   TubeMaster discriminated against Dowd in the terms and conditions of his employment and singularly subjected him to disparate treatment as compared to other employees because of his age in violation of Texas Labor Code § 21.051 and § 21.125.

100.  TubeMaster discriminated against Dowd and terminated Dowd because of his age in violation of Texas Labor Code Chapter 21.051 and 21.125.

101.  TubeMaster's violations of Texas Labor Code Ch. 21 damaged Dowd. Dowd seeks to recover all legal and equitable relief to which he is entitled because of the discriminatory actions of TubeMaster in violation of Texas Labor Code § 21.051 and § 21.125.

102.  Dowd seeks to recover his back pay, front pay, compensatory damages for emotional distress and intangible harms and losses, the value of his lost employment benefits, the equitable remedy of reinstatement, front-pay, pre-judgment and post-judgment interest and his reasonable attorney's fees and costs.

## Disability Discrimination under the ADAAA

103.  Dowd incorporates the preceding paragraphs as if restated.

104.   TubeMaster is an "employer" as defined by the ADAAA. 42 U.S.C. § 12111(5).

105.  Dowd is an "employee" as defined by the ADAAA. 42 U.S.C. § 12111(4). Dowd was qualified to perform his job duties as President at TubeMaster.

106.  Dowd suffers from Crohn's Disease, which is a type of inflammatory bowel disease that affects the lining of the digestive tracts and that can sometimes cause life-threatening complications. It can cause abdominal pain, diarrhea, weight loss, anemia and fatigue. Crohn's Disease is a disability under the ADAAA because it is a condition that

substantially impairs the operation of a major bodily function, including the bowel. 42

U.S.C. § 12102(1) and (2)(B).

107.  Dowd is also a four time cancer survivor. Cancer is a disability and a condition that,

when in its active state, affects the operation of a major bodily function such as normal

cell growth. 42 U.S.C. §12012(1) and (2)(B). Under the ADAAA, an impairment that is

episodic or in remission is a disability if it would substantially limit a major life activity

when active. 42 U.S.C. §12102(4)(D).

108.  Dowd also suffers from claustrophobia, which is an anxiety disorder in which the

sufferer has an irrational fear of having no escape or being closed in. Claustrophobia is a

disability because it substantially interferes with major life activities and with the major

bodily function of normal neurological and brain functioning. 42 U.S.C. § 12103(1) and

(2).

109.  Dowd has a record of having an impairment and was also regarded as having an

impairment under the ADAAA. 42 U.S.C. § 12102(3).

110.  TubeMaster discriminated against Dowd in violation of the ADAAA in the terms

and conditions of his employment because of his disability, his record of a disability and

because TubeMaster regarded Dowd as disabled.

111.  TubeMaster harassed Dowd about his disabilities, which can be exacerbated by

stress. Johns would continually ask Dowd questions about his conditions and ask how

the stress of Johns' actions were affecting Dowd's conditions. Johns made fun of Dowd

for having these conditions and said that Dowd was "not tough." Johns also made offensive "bathroom" jokes to Dowd because of Dowd's Crohn's disease.

112. As for Dowd's claustrophobia, Johns told Dowd it was all "in his head" and that Dowd could "get over it" if Dowd wanted to.

113. TubeMaster refused to accommodate Dowd by letting Dowd avoid entering small, confined spaces on job sites. TubeMaster eventually excluded Dowd from participating in many field projects even though Dowd could perform multiple  services, duties and responsibilities if he remained outside of small, confined spaces.

114. TubeMaster violated the ADAAA by not reasonably accommodating the known limitations of Dowd, who was a qualified individual with a disability in violation of 42 U.S.C. § 12112(b)(5)(A).

115. TubeMaster violated the ADAAA by refusing to engage in the appropriate interactive  dialog with Dowd to discuss the appropriate reasonable accommodations after Dowd made his request for a reasonable accommodation.

116. TubeMaster violated the ADAAA by firing Dowd because of his disability, his record of a disability and because TubeMaster regarded Dowd as disabled.

117. TubeMaster subjected Dowd to a hostile work environment in violation of the ADAAA because of his disability, his record of a disability and because TubeMaster regarded Dowd as disabled.

118. TubeMaster's violations of the ADAAA damaged Dowd. TubeMaster caused Dowd to lose his income and benefits when it fired him in violation of the ADAAA.

119. Dowd seeks to recover all damages to which he is entitled for TubeMaster's violation of the ADAAA, including the recovery of his back pay, fringe benefits, front pay, the equitable remedy of reinstatement, compensatory damages for intangible harms and losses, punitive damages, pre-judgment and post-judgment interest, attorney's fees and costs.

## Disability Discrimination under Texas Labor Code Ch. 21

120. Dowd incorporates the preceding paragraphs as if restated.

121. TubeMaster is an "employer" as defined by Tex. Labor Code § 21.002(8).

122. Dowd is an "employee" as defined by Texas Labor Code § 21.002(7). Dowd was qualified to perform his job duties.

123. Dowd suffers from Crohn's Disease, which is a type of inflammatory bowel disease that affects the lining of the digestive tracts and that can sometimes cause life-threatening complications. It can cause abdominal pain, diarrhea, weight loss, anemia and fatigue. Crohn's Disease is a disability under the ADAAA because it is a condition that substantially impairs the operation of a major bodily function, including the bowel.

124. Dowd is also a four  time cancer survivor. Cancer is a disability and a condition that, when in its active state, affects the operation of a major bodily function such as

normal cell growth. Under the ADAAA, an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

125. Dowd also suffers from claustrophobia, which is an anxiety disorder in which the sufferer has an irrational fear of having no escape or being closed in. Claustrophobia is a disability because it substantially interferes with major life activities and with the major bodily function of normal neurological and brain functioning

126. These conditions are disabilities as defined by Tex. Labor Code § 21.002(6) and (11-a) because they substantially interfere with the major life activity of working and with the normal functioning of Dowd's bowel, neurological system and brain functions.

127. TubeMaster harassed Dowd about his disabilities, which can be exacerbated by stress. Johns would continually ask Dowd questions about his conditions and ask how the stress of Johns' actions were affecting Dowd's conditions. Johns made fun of Dowd for having these conditions and said that Dowd was "not tough." Johns also made offensive "bathroom" jokes to Dowd because of Dowd's Crohn's disease.

128. As for Dowd's claustrophobia, Johns told Dowd it was all "in his head" and that Dowd could "get over it" if Dowd wanted to.

129. TubeMaster refused to accommodate Dowd by letting Dowd avoid entering small, confined spaces on job sites. TubeMaster eventually excluded Dowd from participating in field projects even though Dowd could perform multiple services, duties and responsibilities if he remained outside of small, confined spaces.

130. TubeMaster violated Texas Labor Code Ch. 21 by refusing to provide Dowd with a reasonable accommodation. TubeMaster violated Texas Labor Code Ch. 21 by refusing to engage in an interactive dialog on the appropriate reasonable accommodation after Dowd requested a reasonable accommodation.

131. TubeMaster discriminated against Dowd in violation of Texas Labor Code §21.051 in the terms and conditions of his employment because of his disability, his record of a disability and because TubeMaster regarded Dowd as disabled.

132. TubeMaster violated Texas Labor Code § 21.051 by firing Dowd because of his disability, his record of a disability and because TubeMaster regarded Dowd as disabled.

133. TubeMaster subjected Dowd to a hostile work environment in violation of Texas Labor Code § 21.051 because of his disability, his record of a disability and because TubeMaster regarded Dowd as disabled.

134. TubeMaster's violations of Texas Labor Code § 21.051 damaged Dowd. TubeMaster caused Dowd to lose his income and benefits when it fired him in violation of Texas Labor Code § 21.051.

135. Dowd seeks to recover damages to which he is entitled for TubeMaster's violation of Texas Labor Code § 21.051, including the recovery of his back pay, fringe benefits, front pay, the equitable remedy of reinstatement, compensatory damages for intangible harms and losses, punitive damages, pre-judgment and post-judgment interest, attorney's fees and costs.

## Jury Trial

136. Dowd demands a trial by jury.

## Prayer

WHEREFORE, Plaintiff James Dowd prays this Court enter a judgment in Plaintiff's favor and award Plaintiff the relief sought and enter such other and further relief to which Plaintiff is justly entitled.

## Prayer

WHEREFORE, Plaintiff James Dowd prays this Court enter a judgment for Dowd and against TubeMaster, Inc. on all claims asserted against it and for such other and further relief to which Plaintiff is just entitled.

Respectfully submitted,

/s/ Karen K. Fitzgerald
Karen K. Fitzgerald
State Bar No. 11656750
Fitzgerald Law, PLLC
8150 N. Central Expy, 10th Floor
Dallas TX 75206
214.265.9958 (direct dial)
(214) 367-6001 (fax)
karen@fitzgerald.law

Attorney for Plaintiff James Dowd

## CERTIFICATE OF SERVICE

I certify that on March 19, 2021, I electronically filed the foregoing using the Court's ECF system. The ECF system sent a "Notice of Electronic Filing" to these individuals who have consented in writing to accept this Notice as service of this document by electronic means:

Craig A. McDougal
Raymond Fischer
Camille D. Griffith
Kilpatrick Townsend & Stockton, LLP
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201

_/s/ Karen K. Fitzgerald_
Karen K. Fitzgerald

# EMPLOYMENT CONTRACT AGREEMENT

**THIS EMPLOYMENT CONTRACT AGREEMENT,** made on <u>December</u> , <u>18</u> , <u>2014</u> ,
<span style="font-size:smaller">(Month)          (Day)   (Year)</span>

between Tubemaster, Inc., hereinafter called the "Employer" OF THE FIRST PART

AND

James Dowd, hereinafter called the "Employee" OF THE SECOND PART

### BE IT KNOWN THAT

A) The Employer is duly incorporated, organized and existing under the laws of the state of Kentucky.

B) The Employer is of the opinion that the Employee has the necessary qualifications, experience, and abilities to assist and benefit the Employer in its business.

C) The Employer desires to employ the Employee and the Employee has agreed to accept such contract upon the terms and conditions as set out in this agreement.

### WITNESSETH:

**Term.** The term of this agreement shall begin on <u>January</u> , <u>1</u> , <u>2015</u> , and expire on
<span style="font-size:smaller">(Month)          (Day)   (Year)</span>
December 31st, 2017. Signing this agreement shall be conclusive evidence of intent to fulfill this agreement as written.

**Position Title.** Vice-President - Global Sales & Marketing

**Duties.** The Employee is being compensated for his knowledge and skills related to sales, marketing, and strategic planning. As such, the Employer authorizes the Employee to plan and direct all aspects of marketing and sales policies, objectives, and initiatives. Employee shall develop and oversee the sales function, ensuring that all employees and the sales plan are organized to achieve maximum sales volume. Employee shall develop and oversee the marketing function, identifying key marketing outlets and competitive strategies. Employee shall provide internal and external training as required by the Employer. Employee will be able to perform a variety of tasks as assigned by the Employer, including the ability to lead and direct the work of others. The position shall report directly to the President/CEO position of the Employer.

**Location.** The Employee will be legally based in the Dallas-Ft. Worth, Texas area. Employee will use his existing Plano, Texas office in addition to Employer's Louisville, Kentucky office.

**Travel.** The Employee shall be willing to travel up to 100% for both domestic and international markets as directed by the Employer.

Page 1 of 5



EXHIBIT

1

**Exclusive Services.** Additional consulting or employment within the chemical catalyst services industry is not permitted for the Employee in accordance with the terms and conditions set out in this agreement.

**Compensation.** The Employer shall pay the Employee a base salary of **$1,500.00USD** per week.

- **Bonuses.** Using the Employer's 2014 gross paid sales as a baseline, additional bonus compensation will be paid to the Employee on all incremental sales above the established baseline. A bonus of 22.5% of gross operating profit on all invoiced sales above the established baseline shall be paid on the last day of each month in which paid sales are recorded. Gross operating profit is defined as gross sales minus the cost of goods and services sold minus operating expenses (selling, general, and administrative expenses). (GS-COGS-SGA=GOP)

- **Healthcare.** Employee shall be offered healthcare options as issued for all employees.

- **Short and long-term disability.** Employee shall be offered disability options as issued for all employees.

- **401K.** Employee shall be offered 401K and retirement options as issued for all employees.

- **Vacation.** Employee is granted two (2) weeks of paid vacation time during the first year of service to the Employer. In year 2 of service, Employee is granted three (3) weeks of paid vacation time. In year 3, employee is granted four (4) weeks of paid vacation time. Collection and carry-over of paid vacation time is permitted.

- **Expenses.** The Employee shall be reimbursed for all business related expenses when performing duties for the Employer. Business related expenses are defined as, but not limited to, commercial air transportation; ground transportation including buses, taxis, shuttles, car services, or rental cars; rental car fuel; mileage reimbursement at the maximum government allowed rate when using a personal vehicle; parking and tolls; overnight hotel accommodations; all personal food and beverages when travelling more than ten (10) miles from the Employee's legal address; all business meals, entertainment or event fees regardless of distance from Employee's legal address; trade show or conference fees; communication fees above and beyond standard U.S. local and long distance calls, including cell phone service and data; mailing, printing or office supplies as used directly for the Employer's benefit. All expenses shall be reimbursed within fifteen (15) days of submittal to the Employer.

**Renewal of Contract.** This agreement may be renewed on an annual basis with the written agreement between the Employer and the Employee within ninety (90) days, but not less than thirty (30) days of the contract expiration. Failure to produce a written agreement of renewal within the stated time period will result in the agreement be extended on a month to month basis until said renewal or termination is reached.

**Termination of Contract.** This agreement may be terminated for any reason at the discretion of either the Employer or the Employee. The Employer or the Employee shall be given a ninety (90) day written notice prior to the contract termination. In the event of termination by the Employer, compensation based on the Employee's base salary, all eligible bonuses, healthcare, disability, 401K, and earned vacation shall be paid to the Employee through December 31st, 2017.

**Change of Ownership or Majority Control.** This agreement may also be terminated due to a sale of the Employer's assets, stock or company resulting in a change of ownership or majority control representing more than 50% of the company's value. As compensation for a terminated contract under change of ownership or majority control, the Employer shall pay the Employee in accordance to the terms set forth in this agreement under Termination of Contract. In addition, a one-time lump sum fee equal to one year's base salary and all eligible bonuses shall be paid to the Employee within thirty (30) days of written notice of termination due to a change of ownership or majority control.

**Non-competition Agreement.** The parties agree that the Employer's business is specialized in scope and could suffer damage and loss of goodwill if the Employee entered into competition with the Employer during the term of this agreement. Therefore, the Employee agrees that at no time during the term of this agreement will he, for himself or on the behalf of any person or corporation other than the Employer, engage, own, manage, operate, or control any business related to chemical catalyst services industry.

**Confidentiality Agreement.** It is understood and agreed to that the Employer and the Employee would like to exchange certain information that may be considered confidential. To ensure the protection of such information and in consideration of the agreement to exchange said information, the parties agree as follows:

    **1.** The confidential information to be disclosed by the Employer under this Agreement ("Confidential Information") can be described as and includes: Technical and business information relating to the Employer's proprietary ideas, patentable ideas, copyrights and/or trade secrets, existing and/or contemplated products and services, software, schematics, research and development, production, costs, profit and margin information, finances and financial projections, customers, clients, marketing, and current or future business plans and models, regardless of whether such information is designated as "Confidential Information" at the time of its disclosure. In addition to the above, Confidential Information shall also include, and the Employee shall have a duty to protect, other confidential and/or sensitive information which is (a) disclosed by the Employer in writing and marked as confidential (or with other similar designation) at the time of disclosure; and/or (b) disclosed by the Employer in any other manner and identified as confidential at the time of disclosure and is also summarized and designated as confidential in a written memorandum delivered to the Employee within thirty (30) days of the disclosure.

    **2.** The Employee shall use the Confidential Information only for the purpose of evaluating potential business strategies and relationships with the Employer.

    **3.** The Employee and the Employer shall limit disclosure of Confidential Information within its own organization to its directors, officers, partners, members and/or employees having a need to know and shall not disclose Confidential Information to any third party (whether an individual, corporation, or other entity) without the prior written consent of both parties. The Employee shall have satisfied its obligations under this paragraph if it takes affirmative measures to ensure compliance with these confidentiality obligations by its employees, agents, consultants and others who are permitted access to or use of the Confidential Information.

    **4.** This Agreement imposes no obligation upon the Employee with respect to any Confidential Information (a) that was in the Employee's possession before receipt from the Employer; (b) is or becomes a matter of public knowledge through no fault of the Employee; (c) is rightfully received by the Employee from a third party not owing a duty of confidentiality to the Employer; (d) is disclosed without a duty of confidentiality to a third party by, or with the authorization of, the Employer; or (e) is independently developed by the Employee.

    **5.** The Employer warrants that he/she has the right to make the disclosures under this Agreement.

6. This Agreement shall not be construed as creating, conveying, transferring, granting or conferring upon the Employee any rights, license or authority in or to the information exchanged, except the limited right to use Confidential Information specified in paragraph 2. Furthermore and specifically, no license or conveyance of any intellectual property rights is granted or implied by this Agreement.

7. Neither party has an obligation under this Agreement to purchase any service, goods, or intangibles from the other party. The Employer may, at its sole discretion, using its own information, offer such products and/or services for sale and modify them or discontinue sale at any time. Furthermore, both parties acknowledge and agree that the exchange of information under this Agreement shall not commit or bind either party to any present or future contractual relationship (except as specifically stated herein), nor shall the exchange of information be construed as an inducement to act or not to act in any given manner.

8. Neither party shall be liable to the other in any manner whatsoever for any decisions, obligations, costs or expenses incurred, changes in business practices, plans, organization, products, services, or otherwise, based on either party's decision to use or rely on any information exchanged under this Agreement.

9. If there is a breach or threatened breach of any provision of this Agreement, it is agreed and understood that the Employer shall have no adequate remedy in money or other damages and accordingly shall be entitled to injunctive relief; provided however, no specification in this Agreement of any particular remedy shall be construed as a waiver or prohibition of any other remedies in the event of a breach or threatened breach of this Agreement.

10. This Agreement states the entire agreement between the parties concerning the disclosure of Confidential Information and supersedes any prior agreements, understandings, or representations with respect thereto. Any addition or modification to this Agreement must be made in writing and signed by authorized representatives of both parties. This Agreement is made under and shall be construed according to the laws of the State of Kentucky, U.S.A.

11. If any of the provisions of this Agreement are found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable provision(s) shall be deemed modified to the limited extent required to permit enforcement of the Agreement as a whole.

**Legal Venue.** Venue for any legal proceedings instituted relating to this agreement shall be Collin County, Texas, USA.

**Entire Agreement.** This written agreement contains the sole entire agreement between the parties and shall supersede any and all other agreements between the parties. The parties acknowledge and agree that neither of them has made any representation inducing the execution and delivery hereof except such representatives as are specifically set forth herein and each of the parties hereto acknowledge that they have relied on their own judgment in entering into the same.

**Modifications.** Conditions of this agreement may be modified at any time with the written acceptance of both parties.

**Documentation of Agreement.** Both parties have signed two copies of this agreement and retain originals for their records.

**WHEREFORE,** the parties acknowledge that they have read and understand this Agreement and voluntarily accept the duties and obligations set forth herein.

Signed:

_____          _____
James Dowd (EMPLOYEE)                                              Date   12-18-14

_____          _____
Clifford Johns (EMPLOYER)                                            Date   12/18/14
Authorized representative of Tubemaster, Inc.

Page 5 of 5

**COMPENSATION**

| | |
|---|---|
| Company classification: | Small |
| Revenue: | <2.5M |
| Employees: | <15 |
| Zip: | 40222 |

| Position | Salary | Salary Monthly | Salary Annual | | Bonus | Total | Notes |
|---|---|---|---|---|---|---|---|
| VP-Sale/Marketing | Median | $ 23,745.92 | $ 284,951.00 | | $ 95,959.00 | $ 380,910.00 | |
| President | Median | $ 26,733.34 | $ 320,080.00 | | $ 77,151.00 | $ 397,231.00 | |
| | | | | | | | |
| VP-Sales/Marketing (2015) | Actual | $ 6,933.33 | $ 83,199.96 | | $   - | $ 83,199.96 | 78% BELOW Median average |
| President (2016-present) | Actual | $ 6,933.33 | $ 83,199.96 | | $   - | $ 83,199.96 | 79% BELOW Median average |

Compensation Difference

| | | |
|---|---|---|
| 2015 | $ | (297,710.04) |
| 2016 | $ | (314,031.04) |
| 2017 | $ | (314,031.04) |
| Total | $ | (925,772.12) |

| Option | Year | Salary Monthly | Deferred Salary | Salary Annual | Bonus | Amount Due | Notes |
|---|---|---|---|---|---|---|---|
| 1 | 2016 | $ 6,933.33 | $ 3,066.67 | $ 120,000.00 | | $ 36,800.04 | Payable June 2018 |
| No Obligation | 2017 | $ 6,933.33 | $ 3,066.67 | $ 120,000.00 | | $ 36,800.04 | Payable June 2018 |
| | 2018 | $ 10,000.00 | $   - | $ 120,000.00 | $ 225,007.43 | $ 225,007.43 | Payable June 2018 |

| Option | Year | Salary Monthly | Deferred Salary | Salary Annual | Bonus | Amount Due | Notes |
|---|---|---|---|---|---|---|---|
| 2 | 2016 | $ 6,933.33 | $ 3,066.67 | $ 120,000.00 | $   - | $ 36,800.04 | Payable June 2018 |
| Standard Obligation | 2017 | $ 6,933.33 | $ 3,066.67 | $ 120,000.00 | $   - | $ 36,800.04 | Payable June 2018 |
| Bonus Plan | 2018 | $ 10,000.00 | $   - | $ 120,000.00 | $ 225,007.43 | $ 225,007.43 | Payable December 2018 |
| | 2019 | $ 10,000.00 | $   - | $ 120,000.00 | $ 225,007.43 | $ 225,007.43 | Payable December 2019 |
| | 2020 | $ 10,000.00 | $   - | $ 120,000.00 | $ 225,007.43 | $ 225,007.43 | Payable December 2020 |

| Option | Year | Salary Monthly | Deferred Salary | Salary Annual | Bonus | Amount Due | Notes |
|---|---|---|---|---|---|---|---|
| 3 | 2016 | $ 6,933.33 | $ 3,066.67 | $ 120,000.00 | $   - | $ 36,800.04 | Payable June 2018 |
| Standard Obligation | 2017 | $ 6,933.33 | $ 3,066.67 | $ 120,000.00 | $   - | $ 36,800.04 | Payable June 2018 |
| Salary Plan | 2018 | $ 20,000.00 | $   - | $ 240,000.00 | $ 75,000.00 | $ 75,000.00 | Payable December 2018 |
| | 2019 | $ 22,500.00 | $   - | $ 270,000.00 | $ 75,000.00 | $ 75,000.00 | Payable December 2019 |
| | 2020 | $ 25,000.00 | $   - | $ 300,000.00 | $ 75,000.00 | $ 75,000.00 | Payable December 2020 |

| Option | Year | Salary Monthly | Deferred Salary | Salary Annual | Bonus | Amount Due | Notes |
|---|---|---|---|---|---|---|---|
| 4 | 2016 | $ 6,933.33 | $ 3,066.67 | $ 120,000.00 | $   - | $ 36,800.04 | Payable monthly installment |
| | 2017 | $ 6,933.33 | $ 3,066.67 | $ 120,000.00 | $   - | $ 36,800.04 | Payable monthly installment |
| | 2018 | $ 10,000.00 | $   - | $ 120,000.00 | $ 100,003.30 | $ 100,003.30 | Payable June 2018 |
| | 2019 | $ 10,000.00 | $   - | $ 120,000.00 | $ 100,003.30 | $ 100,003.30 | Payable August 2019 |
| | 2020 | $ 10,000.00 | $   - | $ 120,000.00 | $   - | $   - | |
| | 2021 | $ 10,000.00 | $   - | $ 120,000.00 | $ 100,003.30 | $ 100,003.30 | Payable February 2021 |

| DEFERRED COMPENSATION | AMOUNT | PAID | BALANCE |
|---|---|---|---|
| $ 85,866.76 | $ 6,933.33 | 3/15/2018 | $ 78,933.43 |
| | $ 6,933.33 | 4/15/2018 | $ 72,000.10 |
| | $ 10,000.00 | 5/15/2018 | $ 62,000.10 |
| | $ 10,000.00 | 6/15/2018 | $ 52,000.10 |
| | $ 10,000.00 | 7/15/2018 | $ 42,000.10 |
| | $ 10,000.00 | 8/15/2018 | $ 32,000.10 |
| | $ 10,000.00 | 9/15/2018 | $ 22,000.10 |
| | $ 10,000.00 | 10/15/2018 | $ 12,000.10 |
| | $ 10,000.00 | 11/15/2018 | $ 2,000.10 |
| | $ 2,000.10 | 12/15/2018 | $ (0.00) |



EXHIBIT

tabbies.